Merle C Meyers, Esq., CA Bar #66849
Michele Thompson, Esq., CA Bar #241676
**MEYERS LAW GROUP, P.C.**
44 Montgomery St. Suite 1010
San Francisco, CA 94104
Telephone: (415) 362-7500
mmeyers@meyerslawgroup.com
mthompson@meyerslawgroup.com

Fred T. Isquith (*pro hac vice* forthcoming)
**ISQUITH LAW GROUP PLLC**
222 E 80th Street
New York, NY 10075
Telephone: (607) 227-6513
Isquithlaw@gmail.com

Jeffrey C. Zwerling (*pro hac vice* forthcoming)
**ZWERLING, SCHACHTER & ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
Telephone: (212) 223-3900
jzwerling@zsz.com

Dan Drachler (*pro hac vice* forthcoming)
**ZWERLING, SCHACHTER & ZWERLING, LLP**
1904 Third Avenue, Suite 1030
Seattle, WA 98101
Telephone: (206) 223-2053
ddrachler@zsz.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KERRY WALSH and ALLISON HARROD, individually and on behalf of all other persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ALTRIA GROUP, INC., and JUUL LABS, INC., <br><br> Defendants. | Case No.  20-3183 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

TABLE OF CONTENTS

INTRODUCTION…………………………………………………………… 1

JURISDICTION AND VENUE…………………………………………… 6

INTRADISTRICT ASSIGNMENT ……………………………………….. 7

PARTIES ……………………………………………………………….. 7

AGENTS AND CO-CONSPIRATORS …………………………………...... 10

FACTUAL ALLEGATION…………………………………………………..11

    A.    Development of E-Cigarettes And The Rise of JUUL…………………11

    B.    JUUL's and Altria's 2018 Negotiations And The Resultant Non-Compete Agreement…………………………………………………….. 17

    C.    JUUL's Regulatory Problems And Altria's Responses……………….. 21

CLASS ACTION ALLEGATIONS…....................................................... 28

**CLAIMS FOR RELIEF**

FIRST CLAIM FOR RELIEF Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (On Behalf of the Nationwide Class for Injunctive Relief) …………………………31

SECOND CLAIM FOR RELIEF Violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700, et seq. (By All Plaintiffs on Behalf of the Cartwright Act Class)………………………………………………………………………31

THIRD CLAIM FOR RELIEF Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201(2), et seq. (By Plaintiff Allison Harrod On Behalf of the Florida Class) ……………………………………………………………..33

FOURTH CLAIM FOR RELIEF Unjust Enrichment (By Plaintiffs of Behalf of Each State Class, Respectively) ……………………………………………………….. 34

PRAYER FOR RELIEF ………………………………………………….35

JURY DEMAND ………………………………………………………….36

Plaintiffs Kerry Walsh, Allison Harrod ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by the undersigned attorneys, allege the following against Defendants Altria Group, Inc. ("Altria") and Juul Labs, Inc. ("Juul") for damages, injunctive relief and other relief pursuant to federal antitrust laws, state antitrust, unfair competition, and consumer protection laws, and the laws of unjust enrichment, and demand a trial by jury. The allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based upon publicly available information and the investigation conducted by and through their attorneys, including in substantial part the December 20, 2018 Relationship Agreement and the January 28, 2020 Amended Relationship Agreement between Defendants Altria and Juul.

## INTRODUCTION

1.      This class action involves agreements among horizontal competitors Juul and Altria to eliminate competition by Altria in the market for closed system electronic cigarettes ("e-cigarettes") (as defined below) in exchange for a partial ownership interest in JUUL. These agreements effectuated a horizontal allocation of the market in the sense that JUUL and Altria agreed that the latter would exit the market entirely and instead become a minority shareholder in the former. This conduct constitutes a per se violation of Sections 1 and 3 of the Sherman Act and constituted an unlawful acquisition in violation of Section 7 of the Clayton Act. The agreements also provide the basis for the claims that JUUL monopolized the relevant market of closed system e-cigarettes sold in the United States and its territories and that JUUL and Altria conspired to monopolize that market, all in violation of Section 2 of the Sherman Act. This claim is not based on allegations of circumstantial evidence, but is instead based on explicit written agreements among the Defendants—the "Relationship Agreement", dated December 20, 2018; the "Amended Relationship Agreement", dated January 28, 2020; and a commitment letter from Altria to JUUL, dated October 5, 2018—that contained unequivocal non-compete provisions. On April 1, 2020, the Federal Trade Commission ("FTC") filed an administrative complaint ("FTC Complaint") challenging the lawfulness of both the agreement and the acquisition under Section 5 of the FTC Act (15 U.S.C. § 45) and

1    noting that the conduct in question violated Section 1 of the Sherman Act and Section 7 of

2    the Clayton Act. *Federal Trade Comm'n v. Altria Group, Inc., et al.*, Dkt. No. 9393 (F.T.C.

3    April 1, 2020).[1]

4        2.    JUUL's e-cigarette consists of three components: (a) a flat, rectangular device

5    consisting of an aluminum shell, a battery, a magnet (for the USB charger), a circuit board,

6    an LED light, and a pressure sensor; (b) a USB charger; and (c) a pre-filled, non-reusable e-

7    liquid cartridge (known as a "JUULpod") that serves as a mouthpiece and contains a fixed

8    concentration of nicotine mixed with flavoring and other additives that mimics the ability of a

9    cigarette to deliver nicotine to the human brain. The e-liquid formula ("JUULsalts") is

10   proprietary, contains high levels of nicotine (0.7 mL or 59 mg/mL per pod), and is based on

11   nicotine salts found in leaf-based tobacco, rather than free-based nicotine.[2] The system can

12   deliver a nicotine peak in five minutes, which compares favorably with traditional

13   combustible cigarettes.[3] Use of the loaded device creates a vapor, which is why use of a JUUL

14   system is known as "vaping". The system is a closed one in the sense that it is not modifiable.

15   Since its entry into the e-cigarette market in June of 2015, JUUL quickly became the market

16   _____

17   [1] A redacted version of the FTC Complaint is available at:
     https://www.ftc.gov/system/files/documents/cases/d09393_administrative_part_iii_complai
18   nt- public_version.pdf. The FTC action did not include claims under Section 2 of the
     Sherman Act, but the concurring statement of Commissioners Rohit Chopra and Rebecca
19   Kelly Slaughter ("Chopra Statement") also said that the facts would sustain a claim under
     Section 5 of the FTC Act based on a theory of a conspiracy to monopolize in violation of
20   Section 2 of the Sherman Act.
     https://www.ftc.gov/system/files/documents/public_statements/1570265/statement_of_com
21   m_ch opra_in_the_matter_of_altria-juul.pdf.

22   [2] Huang, J., Dwan C., Kwok, J., *et al.*, *Vaping versus JUULing: how the extraordinary
     growth and marketing of JUUL transformed the US retail e-cigarette market*, Tobacco
23   Control 2019, 28:146-51 at 146 ("Huang Article") available at
     https://tobaccocontrol.bmj.com/content/tobaccocontrol/28/2/146.full.pdf. JUUL currently
24   has two strengths of nicotine in its JUULpods. Each 5% JUULpod, as noted above,
     contains approximately 0.7mL with 5% nicotine by weight (approx. 40 mg per pod based
25   upon 59 mg/mL) at the time of manufacture. Each 3% JUULpod is designed to contain
     approximately 0.7mL with 3% nicotine by weight (approx. 23 mg per pod based upon 35
26   mg/mL) at time of manufacture. https://www.juul.com/resources/JUUL-Pods-Cost-and-
     Pricing-Pods-Prices-for-All- Flavors
27
     [3] Huang Article at 146
28

leader, obtaining a 75% share by October of 2018.[4]

3.     The Altria Group was known until 2003 as Philip Morris Companies, Inc. and is the leading manufacturer of traditional combustible cigarettes in the United States and its territories. Considering the public outcry against and litigation concerning traditional cigarette use, it has expanded into related markets such as smokeless tobacco, cigars, and pipes, always attempting to obtain a dominant position. It entered the e-cigarette market in 2013, when its subsidiary NuMark began trials of the MarkTen e-cigarette.[5] The product was launched nationally in July of 2014[6] and was relatively successful. The Altria Group added to its e-cigarette portfolio by acquiring Green Smoke Inc. for nearly $110 million in cash and $20 million in incentive payments in April of 2014.[7] And in February of 2018, it introduced the MarkTen Elite, a pod- based closed system e-cigarette that resembled JUUL's product in both appearance and structure.[8] At one point, the Altria Group had a 16% share of the e-cigarette market, but its share had declined by mid-2018.[9]

---

[4] Truth Initiative, *Behind the explosive growth of JUUL*, available at https://truthinitiative.org/research-resources/emerging-tobacco-products/behind-explosive-growth-juul.

[5] CNBC, *Marlboro Maker Altria is Jumping Into E-Cigarettes*, available at https://web.archive.org/web/2019022814524 3/https://www.cnbc.com/id/100806458.

[6] M. Felberbaum, *Marlboro maker Altria Group to expand MarkTen electronic cigarette nationally in 2nd quarter*, available at https://web.archive.org/web/20190501084035/https://www.canadianbusiness.com/business-news/marlboro-maker-altria-group-to-expand-markten-electronic-cigarette-nationally-in-2nd-quarter/.

[7] Altria Group, *Altria Announces Agreement to Acquire E-Vapor Business of Green Smoke Inc.,* available at https://web.archive.org/web/20190501084258/https://www.businesswire.com/news/home/20140 203005640/en/Altria-Announces-Agreement-Acquire-E-Vapor-Business-Green.

[8] Difference Between, *Difference Between MarkTen Elite and Juul*, available at http://www.differencebetween.net/science/health/difference-between-markten-elite-and-juul/.

[9] Levy D.T., Sweanor D., Sanchez-Romero L.M., *et al., Altria-Juul Labs deal: why did it occur and what does it mean for the US nicotine delivery product market* at 2 (2019) ("Levy Article") available at https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/08/30/tobaccocontrol-2019- 055081.full.pdf.

4.      The former CEO of the Altria Group, Marty Barrington, laid out the rationale for his company's investment in e-cigarettes during a Consumer Analyst Group of New York conference held on February 21, 2018:

> [W]e knew the industry was evolving and adult tobacco consumers were seeking less harmful alternatives to combustible cigarettes. Preparing for this opportunity, we've spent years acquiring best-in-class regulatory and product development talent and building a compelling portfolio of non-combustible tobacco products with the potential to reduce risk. We've also relentlessly advocated for tobacco regulatory policy that supports bringing innovative reduced-risk products to market and enables manufacturers to communicate truthful information to consumers about those products. Happily, in July 2017, the U.S. Food & Drug Administration (FDA or Agency) adopted this approach as official policy, with the stated goal to "encourage innovative, less harmful and satisfying non-combustible products for adults who want or need nicotine."

> We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products. The range of tobacco products available in the U.S. is diverse when compared to many international markets, and different product platforms appeal to different U.S. adult tobacco consumers. That's why we're taking a portfolio approach, focusing on the three most promising platforms for U.S. adult tobacco consumers: smokeless tobacco and oral nicotine-containing products, e-vapor and heated tobacco. You'll hear more about each in a moment.

> Our approach is clear: to maintain our leadership in combustible tobacco products while vigorously pursuing this innovation aspiration. Going forward, our strategies are to:

> •Maximize income from our combustible tobacco businesses;

> •Grow income over time with non-combustible tobacco products; and

> •Manage our diverse income streams and strong balance sheet to deliver consistent financial performance over the long term.[10]

5.      Seeing the success of JUUL, the Altria Group decided it wanted to buy JUUL and become the dominant market player, just as it was in the traditional cigarette market, where its Marlboro brand accounted for 40% of sales[11] or in the smokeless tobacco market,

---

[10] 2018 Consumer Analyst Group of New York (CAGNY) Conference, available at https://www.sec.gov/Archives/edgar/data/764180/000076418018000020/exhibit992-2018cagnyremarks.htm.

[11] Center for Disease Control & Prevention, *Tobacco Brand Preferences*, available at

where the Altria Group has 55% of sales.[12] It commenced negotiations with JUUL, which intensified in the summer of 2018. As explained in the FTC Complaint, JUUL insisted that a precondition for a purchase of a stake in the company was that the Altria Group exit the market. As the FTC put it in paragraph four of its complaint, "[d]uring negotiations, [JUUL] insisted, and Altria recognized, that Altria's exit from the e-cigarette market was a non-negotiable condition for any deal. When Altria sought to weaken or remove any obligation to exit that market, [JUUL] conveyed that any such attempt was completely unacceptable." The Altria Group accepted this condition in a letter to JUUL dated October 5, 2018 and began dismantling its e-cigarette operations, including pulling the MarkTen Elite products from the market.

6.    Negotiations resumed and a signed deal was reached on December 20, 2018. The Altria Group acquired a 35% stake in JUUL for $12.8 billion. The deal was reflected in a number of separate agreements, including: (a) the actual "Purchase Agreement"; (b) a "Services Agreement", whereby the Altria Group committed to provide various support services to JUUL; an (c) "Intellectual Property Licensing Agreement", which the Altria Group described in a Form 8-K filed with the Securities & Exchange Commission as giving JUUL a "non-exclusive, royalty- free perpetual, irrevocable, sublicensable license to Altria's non-trademark licensable intellectual property rights in the e-vapor field….";[13]and (d) the aforementioned "Relationship Agreement." In the Form 8-K, the Altria Group specifically noted that:

> The Relationship Agreement generally prohibits Altria from competing, or otherwise acquiring an interest in an entity competing, in the e-vapor business for a period of at least six years from Closing [of the transaction], extendable thereafter unless terminated by Altria. If another person were to acquire 40% or more of Altria's

---

https://www.cdc.gov/tobacco/data_statistics/fact_sheets/tobacco_industry/brand_preference/inde x.htm.

[12] Levy Article at 2

[13] Page 3 of Altria Group Form 8-K dated December 19, 2018, available at https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871d 8k.htm.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

voting power, or 30% of Altria's voting power combined with contractual control of a majority of Altria's board of directors, that person would also be subject to certain non-compete obligations set forth in the Relationship Agreement.[14]

7.      These provisions of the Relationship Agreement constitute a naked restraint of trade in the form of a market allocation between horizontal competitors. These provisions continued to be applied in the Amended Relationship Agreement entered by Altria and JUUL on January 28, 2020. Such agreements illegally restrained competition in the relevant market in violation of federal antitrust laws. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs were overcharged and sustained injury to their business and property. Plaintiff and members of the proposed Classes were injured by the elimination of the Altria Group as a competitor in the closed e-cigarette market, paid supracompetitive prices for JUUL's e- cigarettes as a result, and were denied the benefits of competitive innovation that could have existed had the Altria Group stayed in the market as an independent force.

## **JURISDICTION AND VENUE**

8.      Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15, 26, to secure equitable and injunctive relief against Defendants for violating Section 1, 2 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 and 3, and Section 7 of the Clayton Act, 15 US.C, § 18. Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

9.      This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, Section 1, 2 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and 3, Section 7 of the Clayton Act, 15 US.C, § 18, and 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over the state law claims

---

[14] *Id.*

pursuant to 28 U.S.C. § 1332(d) and 1367 because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than one hundred members of the Class, and at least one member of the putative Class is a citizen of a state different from that of one of the Defendants.

10.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

11.     The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

## INTRADISTRICT ASSIGNMENT

12.     Pursuant to N.D. Cal. Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws action was substantially conducted with, directed to or impacted Plaintiff and/or members of the Classes in counties located within the Division and JUUL's principal place of business is located within this Division.

## PARTIES

13.     Plaintiff Allison Harrod is a resident of Florida. Ms. Harrod purchased in Florida JUUL's closed system e-cigarette products indirectly from JUUL at various retail locations during the Class Period, defined as October 5, 2018 through the date on which

Defendants' anticompetitive conduct ceases. Ms. Harrod was injured in her business or property in connection with her purchases during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein.

14.    Plaintiff Kerry Walsh is a resident of Massachusetts. Ms. Walsh purchased JUUL's closed system e-cigarette products indirectly from various retail locations during the Class Period, defined as October 5, 2018 through the date on which Defendants' anticompetitive conduct ceases. Ms. Walsh was injured in her business or property in connection with her purchases during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein.

15.    Defendant JUUL is a Delaware corporation with its principal place of business located at 560 20th Street, San Francisco, California 94107. JUUL is the leading manufacturer of closed-system e-cigarettes, generating over $1 billion in net revenue in 2018.[15] JUUL was initially a division of Pax Labs ("Pax"), a maker of vaporizers based in San Francisco. Pax was founded in 2007 by James Monsees ("Monsees") and Adam Bowen ("Bowen"), both graduates of the design program at Stanford University. Pax raised $13.9 billion in eight funding rounds from venture capitalists such as Fidelity Investment. JUUL's closed system e-cigarette was introduced in June of 2015 and Bowen said it packed a "bigger punch" as compared to other e-cigarettes because it contained ten times as much nicotine. He said that the idea behind the blend was to eliminate the need for smokers to go back to cigarettes after an unsatisfying experience with vaping. As its sales grew, Pax spun off the division and incorporated it as a separate company. Tyler Goldman, then the Chief Executive Officer ("CEO") of Pax, initially ran JUUL, but left in 2017. Kevin Burns ("Burns"), former head of yogurt maker Chobani, became the new CEO. Monsees is the company's chief product officer and Bowen is the company's chief technology officer.[16] During the Class

---

[15] San Francisco Business Times, *Juul Labs revenue soars to more than $1 billion in 2018*, available at https://www.bizjournals.com/sanfrancisco/news/2019/02/01/juul-labs-revenue-soars- to-more-than-1-billion.html.

[16] This history of Pax and JUUL is set forth in more detail in Sharma, R., *The Company Behind JUUL* (Jan. 30, 2020), available at https://www.investopedia.com/news/which-

Period, JUUL sold e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States. JUUL is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement.

16.      Defendant Altria Group is a Virginia corporation headquartered at 6601 West Broad Street, Richmond, Virginia 22320. Prior to 2007, Altria Group also owned the international operations of Philip Morris. In 2007, the company decided to separate the firm's domestic and international operations. According to the Associated Press, the move cleared "the international tobacco business from the legal and regulatory constraints facing its domestic counterpart, Philip Morris USA."[17] Altria Group is one of the country's largest tobacco companies and was, prior to the anticompetitive agreements alleged, a manufacturer of closed-system e-cigarettes. At  a preserved webpage formerly on its website, the Altria Group stated that:

> Altria Group holds diversified positions across tobacco, alcohol and cannabis. Through our wholly owned subsidiaries and  strategic investments in other companies, we seek to provide category-leading choices to adult consumers, while returning maximum value to shareholders through dividends and growth.
>
> Our tobacco companies – which have been the undisputed market leaders in the U.S. tobacco industry for decades – include some of the most enduring names in American business: Philip Morris USA, the maker of Marlboro cigarettes, and U.S. Smokeless Tobacco Company, the maker of Copenhagen and Skoal. We also own John Middleton, manufacturer of Black & Mild cigars, and Nat Sherman, a super-premium cigarette and cigar business. And we have 35 percent ownership of JUUL Labs, Inc., the nation's leading e-vapor company.[18]

17.      During the Class Period, the Altria Group sold e-cigarettes directly or through

company-behind- popular-ecigarette-juul/.

[17] Associated Press, *Altria to spin off Philip Morris International*, available at https://web.archive.org/web/20190516080244/http://www.nbcnews.com/id/20494757/ns/business s-world_business/t/altria-spin-philip-morris-international/.

[18] *Altria, At-A-Glance*, available at https://web.archive.org/web/20190516075707/http://www.altria.com/About-Altria/At-A-Glance/Pages/default.aspx.

its subsidiaries, agents and affiliates to purchasers throughout the United States and its territories. The Altria Group is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement. As noted above, prior to those agreements, the Altria Group sold and marketed e-cigarettes under the brand names MarkTen and Green Smoke. In 2018, the Altria Group generated over $25.364 billion in worldwide net revenues.[19]

18.     Defendant Altria Enterprises is a wholly owned subsidiary of the Altria Group and is located at 6601 West Broad Street, Richmond, Virginia 22320. Altria Enterprises is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement.

19.     Defendants Altria Group and Altria Enterprises are referred to collectively herein as "Altria."

### AGENTS AND CO-CONSPIRATORS

20.     The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

21.     Defendants' agents operated under the authority and apparent authority of their principals.

22.     Defendants, through their subsidiaries, affiliates and agents operated as a single unified entity.

23.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

24.     Each Defendant acted as the principal, agent or joint venture of, or for, other

---

[19] Statista, *Net revenue of Altria worldwide from 2010 to 2019 (in million U.S. dollars)*, available at https://www.statista.com/statistics/500108/net-revenue-of-altria/.

Defendants with respect to the acts, violations, and common course of conduct alleged herein.

**FACTUAL ALLEGATIONS**

**A.    Development of E-Cigarettes And The Rise of JUUL**

25.    The e-cigarette market was initially populated in part by a group of conventional cigarette manufacturers—Altria, Imperial Tobacco Group plc ("Imperial Tobacco"), Japan Tobacco International ("Japan Tobacco"), and British American Tobacco ("BAT")—who were looking to diversify away from their regular cigarette business and by smaller companies like NJoy. NJoy entered the market in 2010, while the tobacco companies entered the market between 2011 and 2014, all before JUUL arrived on the scene in mid-2015. By 2013, the e-cigarette business had revenues of $1.7 billion a year.[20] The numbers increased exponentially when JUUL entered the market. The following chart, taken from a 2018 research article,[21] shows the dollar sales by company from 2011–17 with respect to retail channels tracked by the A.C. Nielsen Company ("Nielsen"):



**Figure 1**    Sales dollar of e-cigarettes in Nielsen-tracked retail channels: by brand 2011–2017.

20    N. Y. Times, Aug. 27, 2018 ("8/27/18 N.Y. Times Article"), available at https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html?referringSource=articleShare.

21 Huang Article at 148.

26.     As can be seen, by the fourth quarter of 2017, JUUL had more sales than any of its competitors, although Altria's sales numbers had been expanding over time.

27.     The market shares of competing traditional tobacco companies declined as a result of JUUL's entry and success. A 2018 research letter published in the *Journal of the American Medical Association* graphically depicts this development for the period from 2013–17.[22]



Figure. e-Cigarette Unit Sales and Market Share of e-Cigarette Unit Sales, by Manufacturer—United States, 2013-2017



28.    Other competitors in the market suffered setbacks that limited their ability to compete. One example is NJoy, which had been a pioneer in the market. As described in the 8/27/18 N.Y. Times Article cited above:

> NJoy gambled on an e-cigarette that looked virtually identical to a cigarette. It was a mistake, said Craig Weiss, the chief executive who pushed the so-called cigalike strategy and now consults for Juul. As NJoy's fortuned flagged, he said he realized that people didn't want a product that looked so much like a cigarette that it still left them with the stigma of being a smoker. NJoy filed for Chapter 11 bankruptcy in 2016, later re-emerging.

29.    Likewise, in April of 2018, R.J. Reynolds Vapor Co., a subsidiary of BAT, had to recall its Vuse Vibe Power Units used in its e-cigarettes because of overheating, which led to a supply disruption.[23]

30.    By October of 2018, JUUL had obtained a monopolistic share of the e-cigarette market.[24]

31.    In a February 11, 2019 presentation, an analyst at Wells Fargo Securities, LLC said that JUUL "re-ignited" the e-cigarette category and depicted its dominance in the following chart.[25]

---

[23] *See* FDA, *Urgent: Voluntary Product Recall of Vuse Vibe Power Units*, available at https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/urgent-voluntary-product-recall-vuse-vibe-power-units.

[24] *See* https://mstobaccodata.org/wp-content/uploads/2019/01/JUUL-and-Other-Emerging-Products_12.6.18.pdf.

[25] Bonnie Herzog, *Wall Street Tobacco Industry Update* at 3 (Feb. 11, 2019), available at http://www.natocentral.org/uploads/Wall_Street_Update_Slide_Deck_February_2019.pdf.



**Source:** Nielsen Total US xAOC/Convenience Database & Wells Fargo Securities, LLC

32.     Altria is the "MO" listed in this chart and it reflects the company's withdrawal from the market in late 2018 because of its non-compete agreement with JUUL.

33.     What accounted for JUUL's rapid success? One critical factor was JUUL's appeal to previous nonsmokers. JUUL's e-cigarette was designed to minimize the harshness of nicotine (the "throat hit"), while maximizing the nicotine impact, thus enabling users to use e-cigarettes more frequently, for longer periods of time.

34.     The Mississippi Presentation noted that it was the first e-cigarette that was "easy to use, maintain, and provide high levels of nicotine"; it was dubbed as the "iPhone of e-cigarettes". A starter pack had a retail price of $44.99 and a pack of four JUULpods cost $15.99. The presentation noted further that the device and the JUULpods were available "directly from JUUL Labs, Inc., other online retailers, and at 12,000 convenience stores in the U.S." By 2019, according to published reports, JUUL products were sold in 100,000 stores nationwide in addition to its own online retail portal.[26]

---

[26] Dees Stribling, *E-Cig Company Juul Planning Retail Stores,* Bisnow (May 21, 2019), available at https://www.bisnow.com/national/news/retail/e-cig-company-juul-planning-retail- stores-99218.

35.    The same presentation noted that the product was introduced with an assortment of flavors—Mango, Cool Mint, Virginia Tobacco, Cool Cucumber, Classic Menthol, Fruit Medley, Creme Brulee, Classic Tobacco.

36.    Another factor in the success of JUUL's product was the way in which it was marketed through, *inter alia*, social media like Twitter, Instagram, or YouTube. As explained in the Huang article referenced above:

> Importantly, our study shows that the growth of JUUL was accompanied by innovative marketing across a variety of new media platforms. The marketing of other major retail e-cigarette brands, at least in their early stages, relied heavily on either advertising on TV (eg, Blu and Njoy) or promotional expenditures to retailers and consumers (eg, Vuse and MarkTen), or both. However, JUUL was one of the first major retail e-cigarette brands that relied heavily on social media to market and promote its products. In particular, we found the number of JUUL-related tweets was highly correlated with quarterly retail sales of JUUL. In addition to Twitter, JUUL was heavily marketed and promoted on Instagram and YouTube. The official JUUL account on Instagram, for example, used a variety of marketing and promotional schemes to attract, engage with and retain followers. The account used artsy, professional-grade photographs to display its products and evoke lifestyle feelings such as relaxation, freedom and sex appeal. Those posts also heavily emphasized JUUL's variety of flavours. Related accounts heavily marketed and promoted JUUL and associated products including pods, skins and accessories. The seven JUUL-related Instagram accounts identified in this study have amassed over a quarter million followers. Additionally, the number of JUUL-related YouTube videos exceeded 100 000 as of 1 March 2018 and engagement with the videos was high. In addition to Twitter, Instagram and YouTube, a recent study found more than 15 000 members discussed JUUL-related themes on Reddit.
>
> Our study also found innovative, cross-platform marketing campaigns to promote JUUL such as 'Doit4juul.' Smaller, targeted campaigns such as JUUL. girls also had a large presence across platforms. Our study reveals affiliate marketing as an important promotional method for JUUL on social media. Such marketing appears as Instagram accounts created by online vendors and product reviews on YouTube. While we cannot verify whether individuals are paid for their JUUL reviews, one young adult reportedly made thousands a month for vaping and reviewing vaping devices on YouTube.[27]

37.    Thus, while a company like Altria used marketing techniques learned from its experience with the conventional cigarette industry, such as promotional expenditures to

_____

[27] Huang Article at 150 (footnotes omitted).

retailers and consumers that delivered price savings to customers (as reflected by the FTC's reference in paragraph 67 of its Complaint to Altria's implementation of a major campaign for shelf space in 2018 that involved slotting fees, retailer discounts, and fixture payments), JUUL favored the use of social media campaigns.[28]

38.    As noted earlier, Altria did fight back with the MarkTen Elite, a slim electronic device with a rechargeable battery and prefilled pods that was similar to JUUL's system. Unlike JUUL's product, the MarkTen Elite was marketed with heavy promotional coupons. One advertisement indicated that a MarkTen Elite device and two pod packs could be purchased for as little as $5.99 and a battery and two pod packs could be purchased for $9.95.[29] The non-compete agreement between Altria and JUUL put an end to this price rivalry. This fact is significant because there is evidence that price differentials are important to consumers of e-cigarettes.[30]

39.    JUUL also positioned its product as a healthy alternative to use of conventional cigarettes; in repeated press releases, it noted how sales of traditional cigarettes were declining while sales of its product were increasing.[31]

---

[28] JUUL's idea of a promotion is reflected currently on its website at https://www.juul.com/promo-code-coupon-offers?&ag=CA. A customer may obtain a "free portable charging case" once there is a commitment to at least a three-month auto-ship subscription with minimum purchases of two JUULpod four-packs per month at regular prices.

[29] *See* https://picclick.com/MARKTEN-ELITE-Cigarette-E-Cig-E-Vapor-Device-113215478911.html

[30] *See* Haung, J., Tauras, J., and Chaluopka, F.J., *The impact of price and tobacco control policies on the demand for electronic nicotine delivery systems,* Tobacco Control 23: iii41-iii47 (2014), available at https://tobaccocontrol.bmj.com/content/tobaccocontrol/23/suppl_3/iii41.full.pdf.

[31] *See* JUUL Labs, Inc., *Cigarette Sales In The U.S. Continue Historic Decline Into The First Quarter Of 2019*, available at https://newsroom.juul.com/cigarette-sales-in-the-u-s-continue- historic-decline-into-the-first-quarter-of-2019/; *Cigarette Decline Rates Accelerate As Juul Share Grows*, available at https://newsroom.juul.com/cigarette-decline-rates-accelerate-as-juul- share-grows/; *JUUL Labs Presents New Data On The Role Of Flavors In Switching From Combustible Cigarettes*, available at https://newsroom.juul.com/juul-labs-presents-new-data-on- the-role-of-flavors-in-switching-from-combustible-cigarettes/.

**B.    JUUL's and Altria's 2018 Negotiations And The Resultant Non-Compete Agreement.**

40.    The negotiations between Altria and JUUL that led to the Relationship Agreement of December 20, 2018 were not publicly documented. JUUL is a private company and has minimal public reporting obligations. Altria only reported on the end result, as reflected in its aforementioned Form 8-K. The allegations that follow are therefore based on the disclosures in the FTC Complaint, which was partially redacted.

41.    As noted above, by the summer of 2018, JUUL had made it clear to Altria that the latter's acquisition of a stake in the former was conditioned on Altria's withdrawal from the e-cigarette market and discontinuance of its MarkTen Elite brand, which JUUL clearly perceived as a competitive threat. That position was communicated unequivocally by Tim Danaher, the former Chief Financial Officer ("CFO") of JUUL; Burns, its former CEO; and Riz Valani ("Valani"), a member of its Board of Directors. On July 30, 2018, Nick Pritzker ("Pritzker"), another member of JUUL's Board, sent Howard Willard ("Willard"), the CEO of the Altria Group who later retired in April of 2020, a draft term sheet for an agreement that incorporated this requirement.

42.    On August 1, 2018, Pritzker, Valani, Burns, Willard, and Billy Gifford, the Altria Group's CFO, met at the Park Hyatt Hotel in Washington, D.C. to discuss the term sheet; no lawyers for either company were permitted to attend. It was clear to Willard that Altria's exit from the e-cigarette market was a precondition to any deal with JUUL. Altria attempted to no avail to modify this demand in discussions held on August 5, 2018. Pritzker, Valani, and Burns reiterated JUUL's position in a mark-up of the term sheet dated August 9, 2018. Valani repeated this blunt message in a meeting with Dinny Devitre, a member of the Altria Group Board of Directors, on August 15, 2018.

43.    The negotiations stalled at that point and Willard capitulated. He stated orally that he would accept this precondition and confirmed it in a letter to Pritzker, Valani, and Burns, dated October 5, 2018. On October 25, 2018, Altria announced that it was suspending

its MarkTen Elite business, purportedly in deference to the FDA's concerns about e-cigarettes that attracted juvenile buyers.[32]

44.    As a result, MarkTen Elite products were no longer available online and inventories in the hands of retailers would not be replenished.[33] A few days later, Altria and JUUL agreed to the basic deal terms. On December 7, 2018, Altria announced that it was exiting the e-cigarette business entirely.[34] On December 20, 2018, the Altria-JUUL agreements were finalized.

> In publicly announcing the deal, JUUL said in a press release: Today, we have been joined by an unlikely – and seemingly counterintuitive – investor in our journey. Altria today announced a minority investment of $12.8 billion into JUUL for a 35% ownership in the company along with services to accelerate our mission. We understand the controversy and skepticism that comes with an affiliation and partnership with the largest tobacco company in the US. We were skeptical as well. But over the course of the last several months we were convinced by actions, not words, that in fact this partnership could help accelerate our success switching adult smokers. We understand the doubt. We doubted as well. We made it very clear that any investment would need to meet demanding and specific criteria to ensure that they are committed to our mission.[35]

45.    One of these criteria was that "an investor would have to allow JUUL to remain in control."[36] The anticompetitive non-compete clause was not mentioned by JUUL.

46.    Article 3.1 of the Relationship Agreement between JUUL and Altria set forth the non-compete agreement. It reads, in relevant part:

> [Altria] shall not . . . directly or indirectly (1) own, manage, operate,

---

[32] *See* Sheila Kaplan, *Altria to Stop Selling Some E-Cigarette Brands That Appeal to Youths*, N.Y. Times, Oct. 25, 2018, available at https://www.nytimes.com/2018/10/25/health/altria- vaping-ecigarettes.html?referringSource=articleShare.

[33] Markten, *Markten® E-Vapor*, available at https://www.markten.com.

[34] Angelica LaVito, *Altria shutters its e-cigarette brands as it eyes Juul, awaits iQOS decision*, CNBC, available at https://www.cnbc.com/2018/12/07/altria-closes-e-cigarette-brands-as-it- eyes-juul-awaits-iqos-decision.html.

[35] JUUL Labs, Inc., *JUUL Statement About Altria Minority Investment And Service Agreements*, available at https://newsroom.juul.com/juul-statement-about-altria-minority-investment-and- service-agreements/.

[36] *Id.*

control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . .

Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued.[37]

47.     Article 3.2 further prohibited competition on an indirect basis.

48.     As noted above, the Relationship Agreement was amended on January 28, 2020. That amendment is discussed in detail below.

49.     Contemporaneous analysts noted the potential anticompetitive aspects of what JUUL and Altria did in entering into the Relationship Agreement. In one 2019 article, it was stated:

This deal directly removes Altria as an independent competitor in the vaping market by terminating its sales of MarkTen. Before Juul entered the US vaping market, Nielsen data from mass market retail (eg, pharmacies and grocery stores) indicated that Altria had a 16% share and the four cigarette companies had a 72% combined share in 2015.

By September 2018, Juul had 72% of the market (dollar value, 55% in units sold), while the share of Altria fell to 7% by July 2018 and combined cigarette firm shares fell to 25%. However, mass market retail was estimated to be 40% of the entire vaping market. Although information is limited on market shares in the vape shop or online consumer channels, cigarette manufacturers have generally not sold their vaping products in these sectors.

_____
[37] The full text of the Relationship Agreement is available at https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex22.htm.

> With MarkTen having had a small and declining vaping market share, the impact of their exit from the market is likely to be minimal. However, Altria's potential role as a future competitor is likely more important. After the Juul Labs deal, Altria has less incentive to introduce new vaping products….
>
> The deal can also impede competition by Altria working with Juul Labs (eg, through onserts on the outside of packages with coupons for Juul and providing their customer lists for marketing purposes) to insure that those smoking Altria products (eg, Marlboro) switch to Juul rather than other e-cigarette companies' products. To the extent that brand loyalty is created for Juul products, new entrants will face greater barriers to market entry. In addition, Altria is likely to help Juul Labs fight patent infringement cases.[38]

50.    The FTC echoed some of these concerns in its Complaint. As the FTC noted in paragraph 62 of its Complaint, the effect of the JUUL-Altria agreement was to: (a) "eliminat[e] MarkTen products from the relevant market, thereby eliminating current and future price competition between [JUUL and Altria], in particular promotional activity to create awareness and drive sales"; (b) eliminate "current and future innovation competition" between the companies; and (c) eliminate "current and future competition between [JUUL and Altria] for shelf space at retailers through rebates and other incentives." All of these identified harms constitute injury to Plaintiff and members of the Classes.

51.    Altria acquired a 35% stake in JUUL for $12.8 billion as a result of the deal. For this amount, Altria got one "observer" to JUUL's Board, at least until the FTC cleared the transaction, which it obviously has not. As the FTC explained at paragraphs 23–24 of its Complaint with respect to the other agreements entered into between JUUL and Altria:

> Though it was later amended, under the initial Services Agreement, Altria agreed to provide certain services to [JUUL], divided between Initial and Extended Services. The Initial Services included leasing convenience store shelf space to [JUUL], regulatory consulting, and distribution support; the Extended Services included direct marketing support and sales services. Under the terms of the Relationship Agreement, the Non-Compete went into effect early in 2019 when Altria began to perform Extended Services. The Services Agreement had an initial six-year term, subject to early termination by mutual consent or in case of material breach, bankruptcy, or insolvency. If the Services Agreement expired, Altria could discontinue the Non-Compete, at which point it would lose its right to appoint [JUUL] board members and its pre-emptive right to

---

[38] Levy Article at 2 (footnotes omitted).

maintain its 35% stake in the company, but would regain its ability to compete in the market against [JUUL].

The Intellectual Property License Agreement grants [JUUL] a broad, non-exclusive, irrevocable license to Altria's e-cigarette intellectual property portfolio.

52.    The Relationship Agreement constitutes per se antitrust violations of Section 1 and 3 of the Sherman Act, collusive conduct in violation of Section 2 of the Sherman Act, and violates state antirust, consumer protection and unjust enrichment laws. JUUL and Altria are separate companies; neither owned the other. No joint venture was created between them. Instead, they were horizontal competitors who agreed that one of them would exit the market.

### C.    JUUL's Regulatory Problems And Altria's Responses.

53.    Even before the Altria-JUUL deal was finalized, JUUL was facing severe regulatory criticism for marketing its e-cigarette products to teenagers. In April of 2018, FDA Dr. Scott Gottlieb ("Gottlieb") of the Food & Drug Administration ("FDA") announced a "Youth Tobacco Prevention Plan" that would close access to e-cigarettes by minors; he pointed to numerous illegal sales of JUUL products in this respect.[39] In September of 2018, the FDA announced that it had undertaken the largest coordinated enforcement effort in its history issuing 1,300 warning letters or fines to retailers who sold JUUL and other e-cigarettes to minors as part of an "undercover blitz" of brick-and-mortar and online retailers.[40] The agency also served JUUL and other manufacturers with comprehensive document requests.[41] JUUL reported providing the agency with over 50,000 pages of

---

[39] *See* FDA, *Statement from FDA Commissioner Scott Gottlieb, M.D., on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes*, available at https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-enforcement-actions-and- youth-tobacco-prevention

[40] *See* FDA, *FDA takes new steps to address epidemic of youth e-cigarette use, including a historic action against more than 1,300 retailers and 5 major manufacturers for their roles perpetuating youth access*, available at https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-youth-e-cigarette-use-including-historic- action-against-more.

[41] *Id.*

documents.[42]

54.     JUUL reacted to the FDA criticism. On November 3, 2018, it discontinued retail sales of its mango, cucumber, creme and fruit JUULpods to third party retailers and instead limited the distribution of these products to JUUL's own online shop.[43]

55.     That was not enough for the agency. On September 9, 2019, the FDA sent JUUL a warning letter that stated: "[b]ased on our review of the information described above, FDA has determined that JUUL adulterated its products under section 902(8) of the FD&C Act (21 U.S.C. § 387b(8)) by selling or distributing them as modified risk tobacco products without an FDA order in effect that permits such sale or distribution."[44] Thus, JUUL was accused of illegally selling its e-cigarettes. JUUL responded by first eliminating sales in the United States and its territories of its fruit-flavored JUULpods on October 17, 2019.[45] Thereafter, JUUL eliminated sales of mint- flavored JUULpods on November 7, 2019.[46]

56.     Gottlieb was also not pleased with Altria after it became a stakeholder in JUUL. On February 6, 2019, he wrote a letter to Willard of Altria saying Altria's plans for JUUL "contradict[ed] the commitments you made to the FDA in a meeting" held on October 18, 2018. He demanded another meeting and said that "[w]hen we meet, Altria should be prepared to explain how this acquisition affects the full range of representations you made to the FDA and the public regarding your plans to stop marketing e-cigarettes and to address the crisis

---

[42] JUUL Labs, Inc., *Statement Regarding Recent FDA Inspection*, available at https://newsroom.juul.com/statement-from-kevin-burns-juul-labs-chief-executive-officer-regarding-recent-fda-inspection/.

[43] JUUL Labs, Inc., *JUUL Labs Action Plan*, available at https://newsroom.juul.com/juul-labs- action-plan/.

[44] FDA, *Warning Letter JUUL Labs, Inc.*, available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

[45] JUUL Labs, Inc., *JUUL Labs Suspends Sale Of Non-Tobacco, Non-Menthol-Based Flavors In The U.S.*, available at https://newsroom.juul.com/juul-labs-suspends-sale-of-non-tobacco-non- menthol-based-flavors-in-the-u-s/.

[46] https://newsroom.juul.com/juul-labs-stops-the-sale-of-mint-juulpods-in-the-united-states/.

of youth use of e-cigarettes."[47] Altria, JUUL, and Gottlieb met in March of 2019, but Gottlieb was reported as saying that the meeting was "difficult" and that "he did not come away with any evidence that public health concerns drove Altria's decision to invest in Juul."[48] The concurring statement of FTC Commissioners Chopra and Slaughter in support of the filing of the FTC Complaint cited above reached a similar conclusion:

> [I]n October 2018, Altria publicly claimed that it was discontinuing its e-cigarette product due to concerns about youth vaping. This appears to be a pretext, as it was simultaneously looking to strike a massive deal with JUUL. With Altria's MarkTen out of the market, basic economic logic suggests that JUUL could capture those sales and further dominate the market.[49]

57.    The problems that JUUL and Altria had with the FDA were not the only ones they faced with regulators. In 2019, various states and municipalities began imposing bans on JUUL and/or vaping products.[50]

58.    In light of this cascade of bad news, Altria reacted by flexing its muscle as a shareholder and precipitating the ouster of some of JUUL's management. In September of 2019, Burns resigned as JUUL's CEO, and was replaced by K.C. Crosthwaite ("Crosthwaite"), a Senior Vice-President of Altria Group who served as its Chief Growth Officer, oversaw Altria's entry into the e-cigarette market and was Altria's designated interim "observer" on JUUL's Board pursuant to the terms of the Relationship Agreement.[51]

---

[47] S. Gottlieb, Letter to Howard A. Willard III, dated 6 February 2019, available a https://web.archive.org/web/20190304113102/https://www.fda.gov/downloads/TobaccoProducts/Labeling/RulesRegulationsGuidance/UCM630925.pdf.

[48] K. Rooney, A. LaVito, *Altria shares fall after FDA's Gottlieb describes 'difficult' meeting on Juul,* CNBC News, 19 (March 2019), available at https://www.cnbc.com/2019/03/19/altria-shares-fall-after-fdas-gottlieb-describes-difficult-meeting-on-juul.html; A. Edney, *FDA Chief to Keep Heat on E-Cigarette Makers as He Departs,* available at https://web.archive.org/web/20190501083309/https://www.bloomberg.com/news/articles/2019-03-19/gottlieb-says-fda-may-need-to-pull-nicotine-pods-from-market

[49] Chopra Statement at 2.

[50] *See* Drugwatch, *Juul Ban*, available at https://www.drugwatch.com/e-cigarettes/juul-ban/.

[51] JUUL Labs, Inc., *JUUL Labs Names New Leadership, Outlines Changes To Policy And Marketing Efforts*, available at https://newsroom.juul.com/juul-labs-names-new-leadership-

Crosthwaite is in the process of revamping certain executive positions. In October of 2019, he brought in as JUUL's new chief regulatory officer Joe Murillo ("Murillo") of the Altria Group; Murillo was the head of regulations at the Altria Group and previously ran the e-cigarette side of its business.[52]

59.    Altria also took the opportunity to revise some of its December 2018 agreements with JUUL. The Services Agreement, Voting Agreement, and Relationship Agreement between Altria and JUUL were amended on January 31, 2020. The FTC describes the amendments as follows in paragraphs 26–28 of its Complaint:

> Under the Revised Voting Agreement, after the Antitrust Conversion, Altria will instead have the right to (1) appoint two (of nine) JLI directors; (2) nominate one (of three) [JUUL] independent directors; (3) appoint one (of four) members of a Nominating Committee (who would have the right to veto independent director nominations); (4) appoint two (of five) members and the chair of a new Litigation Oversight Committee (which would have responsibility for managing litigation involving both Altria and [JUUL], i.e., "Joint Litigation Matters"); and (5) appoint one (of three) members of a Litigation Subcommittee (which would have authority, by unanimous vote, to change [JUUL's] senior outside counsel responsible for Joint Litigation Matters). The Revised Voting Agreement would further grant [JUUL's] CEO (1) a board seat, (2) a seat on the Litigation Oversight Committee, and (3) a seat on the Litigation Subcommittee.

> The Amended Relationship Agreement gives Altria the option to be released from the Non-Compete if [JUUL] is prohibited by federal law from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial value of $12.8 billion.

> The Amended Services Agreement eliminates all services except for regulatory support services. The amendment was effective at signing except as regards to Altria's provision of retail shelf space to [JUUL], which service terminates after March 31, 2020.

60.    On January 30, 2020 Altria had filed an SEC Form 8-K that further described the Amended Relationship Agreement as follows:

> The amendment to the Relationship Agreement provides for, among

outlines-changes-to-policy-and-marketing-efforts/.

[52] Carlie Porterfield, *Juul Hires Another Altria Exec To Handle Vaping Crackdown*, Forbes (Oct. 2, 2019), available at https://www.forbes.com/sites/carlieporterfield/2019/10/02/juul-hires- another-altria-exec-to-handle-vaping-crackdown/#6453ab412c72.

other things: (i) following antitrust clearance of the JUUL Investment, creation of a Litigation Oversight Committee of the JUUL board of directors, which will include two Altria designated directors (one of whom will chair such committee), that will have oversight authority and review of litigation management for matters in which JUUL and Altria are co-defendants and have or reasonably could have a written joint defense agreement in effect between them and, subject to certain limitations, will recommend to JUUL changes to outside counsel and litigation strategy by majority vote, with disagreements by JUUL's management being resolved by majority vote of JUUL's board of directors; and (ii) Altria to have the option to be released from its non-compete obligation (x) in the event JUUL is prohibited as a matter of federal law from selling vapor-based electronic nicotine delivery systems in the U.S. for a continuous period of at least 12 months (subject to tolling of this period in certain circumstances) or (y) if the carrying value of Altria's investment in JUUL is not more than $1.28 billion (which represents 10% of Altria's $12.8 billion initial carrying value of the JUUL investment).[53]

61.    The FDA has not prohibited JUUL from selling vaping products in the United States and its territories for at least a year. On January 2, 2020, the agency adopted a policy that prioritized its enforcement efforts with respect to e-cigarettes. It stated:

On Aug. 8, 2016, all e-cigarettes and other ENDS [electronic nicotine delivery systems] products became subject to the FDA's tobacco authorities, including the premarket authorization requirements in the Federal Food, Drug, and Cosmetic Act (FD&C Act). All e-cigarettes and other ENDS products on the market at that time needed to have authorization from the FDA to be legally marketed. However, as an exercise of its enforcement discretion, the agency had deferred enforcement of the premarket authorization requirements. To date, no ENDS products have been authorized by the FDA — meaning that all ENDS products currently on the market are considered illegally marketed and are subject to enforcement, at any time, in the FDA's discretion.

Beginning 30 days from the publication of the notice of availability of this guidance in the Federal Register, the FDA intends to prioritize enforcement against these illegally marketed ENDS products by focusing on the following groups of products that do not have premarket authorization:

---

[53] https://www.sec.gov/ix?doc=/Archives/edgar/data/764180/000076418020000005/a2019form8

-kerq42019.htm. The Amended Relationship Agreement itself can be found at https://www.sec.gov/Archives/edgar/data/764180/000076418020000005/exhibit21q42019.htm.

—Any flavored, cartridge-based ENDS product (other than a tobacco- or menthol-flavored ENDS product);

—All other ENDS products for which the manufacturer has failed to take (or is failing to take) adequate measures to prevent minors' access; and

—Any ENDS product that is targeted to minors or likely to promote use of ENDS by minors.

Cartridge-based ENDS products are a type of ENDS product that consists of, includes, or involves a cartridge or pod that holds liquid that is to be aerosolized when the product is used. For purposes of this policy, a cartridge or pod is any small, enclosed unit (sealed or unsealed) designed to fit within or operate as part of an ENDS product.

By not prioritizing enforcement against other flavored ENDS products in the same way as flavored cartridge-based ENDS products, the FDA has attempted to balance the public health concerns related to youth use of ENDS products with considerations regarding addicted adult cigarette smokers who may try to use ENDS products to transition away from combustible tobacco products. In addition to data showing that cartridge-based ENDS products are most commonly used among youth, important findings from the 2019 Monitoring the Future survey focusing on youth use of JUUL indicate that youth preference for menthol- and tobacco- flavored e-cigarettes is much lower than that for mint- and fruit- flavored e-cigarettes. Because of the relatively low numbers of youth using both menthol- and tobacco-flavored, cartridge-based ENDS products, these products are not among the current enforcement priorities. However, should the FDA become aware of an increase of youth using any other flavored products (both cartridge-based or otherwise), the agency will take additional steps to address youth use of those products if necessary.

For all other products (cartridge-based or otherwise), including menthol-, tobacco-, and non-flavored ENDS products, the FDA will also prioritize enforcement where the manufacturer fails to take adequate measures to prevent youth access. For example, the FDA will consider whether the manufacturer has implemented adequate programs to monitor retailer compliance with age-verification and sales restrictions or if it has established and enforced penalties against retailers that fail to comply with those programs. The agency also will consider whether the manufacturer uses adequate age-verification technology (or requires that retailers who sell its products use such technology) to prevent underage access to its website and to prevent underage sales through the internet. In addition, consideration will be given to whether the manufacturer limits (or requires retailers who sell its products to limit) the quantity of ENDS products that a customer may purchase within a given period of time.

The FDA also intends to prioritize enforcement with respect to any ENDS products that are targeted to youth or likely to promote use of

ENDS by youth. Examples include: products marketed with labeling and/or advertising that resemble kid-friendly foods and drinks such as juice boxes or kid-friendly cereal; products marketed directly to minors by promoting ease of concealing the product or disguising it as another product; and products marketed with characters designed to appeal to youth.

Importantly, the FDA's enforcement priorities are not a "ban" on flavored or cartridge-based ENDS. The FDA has already accepted and begun review of several premarket applications for flavored ENDS products through the pathway that Congress established in the Tobacco Control Act. Manufacturers that wish to market any ENDS product – including flavored e-cigarettes or e-liquids – are required by law to submit an application to the FDA that demonstrates that the product meets the applicable standard in the law, such as whether the product is appropriate for the protection of the public health. If a company can demonstrate to the FDA that a specific product meets the applicable standard set forth by Congress, including considering how the marketing of the product may affect youth initiation and use, then the FDA could authorize that product for sale.

The guidance also states that, after May 12, 2020, the FDA intends to also prioritize enforcement against any ENDS products that continue to be sold and for which the manufacturers have not submitted a premarket application. For ENDS products other than those in the three groups described above, if premarket applications are submitted by that date, the FDA intends to continue to exercise enforcement discretion for up to one year pending FDA review of the applications, unless there is a negative action by the FDA on such application or the product is authorized to be marketed by the FDA.[54]

62.     Thus, the upshot of the FDA's guidance was that while it had the statutory power to force all e-cigarettes off the market as being sold illegally, it exercised its discretion not to do so and focused its enforcement authority on non-tobacco or non-menthol flavored e-cigarettes and e-cigarettes marketed to customers under the age of 21. JUUL had ceased selling fruit-flavored or mint-flavored e-cigarettes in October and November of 2019 and had modified its marketing policies so that it did not target persons under the age of 21. To this day, it continues to market e- cigarettes with Virginia Tobacco, Classic Tobacco, and Menthol flavoring. The FDA's notice makes it clear that it has no intention of banning

---

[54] FDA, *FDA finalizes enforcement policy on unauthorized flavored cartridge-based e-cigarettes that appeal to children, including fruit and mint*, available at https://www.fda.gov/news- events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge- based-e-cigarettes-appeal-children. *See also* 85 Fed. Reg. 720 Jan. 7, 2020).

outright the sale of these types of e-cigarettes. The agency will be requiring manufacturers to submit premarket applications for e-cigarettes pursuant to the Tobacco Control Act by May 12, 2020 and this requirement applies to e-cigarettes already being marketed, but the FDA made it clear that tobacco-flavored or menthol-flavored e- cigarettes not being marketed to people under the age of 21 will be subject to an informal grace period of up to one year while the applications are being considered. JUUL is on record as saying it will be filing a premarket application in May of 2020.[55] So there is no immediate danger of JUUL being "prohibited by federal law from selling vaping products in the United States for at least a year" and the non-compete clause contained  in the Relationship Agreement between JUUL and Altria remains in full force and effect.[56]

**CLASS ACTION ALLEGATIONS**

63.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons or entities in the United States that purchased e-cigarettes and/or pods indirectly from Juul, for personal use and not resale, from October 5, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). The following persons and entities are excluded from the Class: Defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates; federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; and the judges in this case and any members of their immediate families.

64.     Plaintiffs also bring this class action on behalf of themselves and all others similarly situated under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure,

---

[55] *See* JUUL Labs, Inc., *Our Commitment To The PMTA Process*, available at https://newsroom.juul.com/our-commitment-to-the-pmta-process/.

[56] Likewise, Altria has not written down the value of its $12.8 billion investment in JUUL below $1.28 billion. It has written down the value of that investment by a total of $8.6 billion, in separate writeoffs undertaken in October of 2019 and January of 2020. M. Corey Goldman, *Altria Writes Down Another $4.1 Billion of Its Juul Investment*, TheStreet.com (Jan. 30, 2020), available at https://www.thestreet.com/investing/stocks/altria-takes-another-massive-writedown- on-juul-investment

seeking damages and injunctive relief on behalf of the following multistate Cartwright Act

Class ("the Cartwright Act Class"):

> All persons or entities in the States of Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin (the "Indirect Purchaser States") who purchased e-cigarettes and/or pods indirectly from Juul, for personal use and not resale, from October 5, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

65.    Additionally, Plaintiffs bring this class action on behalf of themselves and all

others similarly situated under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure,

seeking damages and injunctive relief on behalf of the following individual State Damages

Class:

> The Florida Class:  All persons or entities in the State of Florida that purchased e-cigarettes and/or pods indirectly from Juul, for personal use and not resale, from October 5, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

66.    The same persons and entities excluded from the Nationwide Class are

excluded from each State Class.

67.    The Class is sufficiently numerous. Plaintiffs believe that the Class is so

numerous and widely geographically dispersed throughout the United States that joinder of

all members is impracticable. Moreover, given the costs of complex antitrust litigation, it

would be uneconomic for many plaintiffs to bring individual claims and join them together.

68.    Plaintiffs will fairly and adequately protect and represent the interests of the

Class. The interests of Plaintiffs are aligned with, and not antagonistic to, those of the other

members of the Class.

69.    Plaintiffs are represented by counsel who are experienced and competent in the

prosecution of class action antitrust litigation and have particular experience with indirect

antitrust litigation on behalf of end user consumers.

70.    Questions of law and fact common to members of the Class predominate over

questions, if any, that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable questions are inherent in Defendants' wrongful conduct.

71.     Questions of law and fact common to the Classes include:

a.     whether the conduct alleged herein constitutes a violation of the federal antitrust laws;

b.     whether the U.S. and various State markets for closed-system e-cigarettes constitutes a relevant market;

c.     whether Defendants possess sufficient market power in the relevant market to cause anticompetitive effects;

d.     whether Juul possesses monopoly power in the relevant market;

e.     whether the conduct alleged herein caused anticompetitive effects in the relevant market(s);

f.     whether Defendants monopolized or attempted to monopolize the U.S. and various State markets for closed-system e-cigarettes;

g.     whether Defendants' conduct, as alleged in this Complaint, caused Plaintiffs and the Classes to pay supracompetitive prices for e-cigarettes and thereby suffer antitrust injury;

h.     the appropriate injunctive relief for the Classes; and the appropriate measure of damages sustained by Plaintiffs and other members of the Classes.

72.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

73.     Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(On Behalf of the Nationwide Class for Injunctive Relief)**

74.     Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs as if fully set forth herein.

75.     At all times relevant to this action, Defendants had monopoly power in the market for the sale of closed-system e-cigarettes in the United States. Juul controls at least 75% of the relevant market in the United States. Moreover, there are high barriers to entry in the market for closed-system e-cigarettes, including both technological and regulatory barriers.

76.     Defendants have engaged in exclusionary conduct designed to prevent competition on the merits in the relevant market for closed system e-cigarettes, and thereby maintain and enhance their monopoly position in that market.

77.     Defendants' anticompetitive conduct has decreased price competition in the relevant market, deprived consumers of free choice, and imposed antitrust price injury on wholesale distributors and end user customers.

78.     There are no legitimate business or pro-competitive justifications for Defendants' conduct and any purported legitimate business justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

79.     If not enjoined, Defendants will continue to engage in anticompetitive conduct that will further injure wholesalers, end users, and competition.

### SECOND CLAIM FOR RELIEF
**Violation of California's Cartwright Act,**
**Cal. Bus. & Prof. Code § 16700, et seq.**
**(By All Plaintiffs on Behalf of the Cartwright Act Class)**

80.     Plaintiffs repeat and reassert each of the allegations contained in the preceding

paragraphs as if fully set forth herein.

81. The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

82. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

83. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

84. A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id*. at § 16726.

85. Plaintiffs purchased closed-system e-cigarettes within the State of California during the Class Period.  But for Defendants' conduct set forth herein, the price of closed-system e-cigarettes would have been lower, in an amount to be determined at trial.

86. Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

87. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct preventing Plaintiffs in the exercise of due diligence from uncovering the unlawful conduct.

88. Plaintiffs and members of the Cartwright Act Class were injured in their business or property, with respect to purchases of closed-system e-cigarettes nationwide and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201(2), et seq.**
**(By Plaintiff Allison Harrod**
**On Behalf of the Florida Class)**

89.    Plaintiff Allison Harrod, for themselves and on behalf of the Florida Class, repeat and reallege each of the allegations contained in paragraphs 1 to 166 as if fully set forth herein.

90.    The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

91.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

92.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

93.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("…anyone aggrieved by a violation of this [statute] may bring an action…").

94.    Plaintiff Allison Harrod purchased Juuls within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Juul would have been lower, in an amount to be determined at trial.

95.    Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the e-cigarette market, a substantial part of which occurred within Florida.

96.    Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for the e-cigarettes, for the purpose

of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2000 and continuing through the date of this filing.

97.    Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

98.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

99.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for the e-cigarettes and are threatened with further injury.

100.    By reason of the foregoing, Plaintiffs and the members of the Florida Class is entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(By Plaintiffs of Behalf of Each State Class, Respectively)**

101.    Each Plaintiff repeats and reasserts each of the allegations contained in the preceding paragraphs as if fully set forth herein on behalf of the State Class in which he or she purchased closed-system e-cigarettes.

102.    Plaintiffs purchased closed-system e-cigarettes within their States of residence during the Class Period. But for Defendants' conduct set forth herein, the price of closed-system e-cigarettes would have been lower, in an amount to be determined at trial.

103.    Defendants unlawfully overcharged Plaintiffs and end payers, who made purchases of Defendants' closed-system e-cigarettes in their States of residence at prices that were more than they would have been but for Defendants' actions.

104.    Defendants have been enriched by revenue resulting from unlawful overcharges

for Juul's closed-system e-cigarettes.

105.    Plaintiffs and State Class members have been impoverished by the overcharges for Defendants' closed-system e-cigarettes resulting from Defendants' unlawful conduct.

106.    Defendants' enrichment and Plaintiffs' impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received from Plaintiffs and State Class Members.

107.    There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and Class members' impoverishment, because Plaintiffs and State Class members paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

108.    Plaintiffs and State Class members have no remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

(A)    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff as class representative and Plaintiff's counsel as Class Counsel;

(B)    Award Plaintiffs and the Class damages in an amount to be determined at trial, plus interest in accordance with law;

(C)    Enter judgment against Defendant and in favor of Plaintiffs and the Class;

(D)    Declare the agreements alleged herein invalid and unenforceable;

(E)    Grant injunctive relief that restores Defendants' incentives to compete in the relevant market, including, as appropriate, divestiture of Altria's equity stake in Juul, rescission of Altria's purchase of that stake, and/or any other relief;

(F)    Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

(G)    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

1

## JURY DEMAND

2

Plaintiffs hereby demand a trial by jury.

3

Dated: May 8, 2020                          */s/ Jeffery C. Zwerling*

4
Merle C Meyers, Esq., CA Bar #66849
Michele Thompson, Esq., CA Bar #241676

5
**MEYERS LAW GROUP, P.C.**
44 Montgomery St. Suite 1010

6
San Francisco, CA 94104
Telephone: (415) 362-7500

7
mmeyers@meyerslawgroup.com
mthompson@meyerslawgroup.com

8

9
Jeffrey C. Zwerling (*pro hac vice* forthcoming)

10
**ZWERLING, SCHACHTER & ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010

11
Telephone: (212) 223-3900

12
jzwerling@zsz.com

13
Fred T. Isquith (*pro hac vice* forthcoming)

14
**ISQUITH LAW GROUP PLLC**
222 E 80th Street

15
New York, New York 10075
Telephone: (607) 227-6513

16
Isquithlaw@gmail.com

17

18
Dan Drachler (*pro hac vice* forthcoming)

19
**ZWERLING, SCHACHTER & ZWERLING, LLP**
1904 Third Avenue, Suite 1030

20
Seattle, WA 98101
Telephone: (206) 223-2053

21
ddrachler@zsz.com

22
*Counsel for Plaintiffs*

23

24

25

26

27

28